June 5, 2000

To Whom It May Concern:

    This letter is to explain the event that took place at the Washington Hilton Sport and Health Club on Sunday, May 21, 2000. Fred Schefer, member #802462, was using the courtesy phone on a personal call. Apparently, Mr. Schefer was on the phone and was being quite loud. Ron Nichols, an employee of the Club, was working behind the desk. Mr. Nichols asked Mr. Schefer to keep it down. (Mr. Nichols was not aware that Mr. Schefer was not a member of the Club. He thought he was a friend of Cicily Blackman, the assistant manager of the Club, and mine.) Mr. Schefer asked Mr. Nichols if there was a problem. Mr. Schefer walked up to the front desk and got into an argument with Mr. Nichols. Mr. Schefer called Mr. Nichols a "nigger" and then pushed Mr. Nichols while he was behind the desk. I was in Hagerstown, Maryland at the time the incident occurred. Ms. Blackman, the assistant manager at the Club, called me on my cell phone to tell me that Ron had called her and explained to me what had happened. Ms. Blackman told me that Ron wanted me to come into the Club because he was upset about what had happened. Ms. Blackman said that Mr. Nichols was going to "close the Club" if I did not come. However, Ms. Blackman called me again and told me that Ron didn't need to have me come to the Club.

    The next day Mr. Schefer confirmed to me that he had called Mr. Nichols a "nigger". I also talked to a member named Brett Kitchen who said he saw the incident at the front desk. Mr. Kitchen said he saw Mr. Schefer push Mr. Nichols. He said Mr. Schefer was blocking the desk and kept Mr. Nichols from moving out from behind the desk, which resulted in the pushing.

    I was not able to take any further action because my company had gone on our annual retreat so I decided to wait until I returned to the Club. When I got to work on Tuesday, May 30th, Mr. Nichols informed Ms. Blackman and myself that he would like to have a meeting with us. In the meeting, Ms. Blackman and myself asked Mr. Nichols what he would like us to do about the situation. At this moment, I had to leave the office in order to show a potential member around the Club. However, Mr. Nichols never informed Ms. Blackman what he thought we should do about the incident. He was more concerned if we still "liked" him. He said we were being "retaliatory" against him because no one was talking to him. I told him I fully supported him. I told him Mr. Schefer shouldn't have talked to him like he did but I also told Mr. Nichols that there was probably a better way to have handled the situation. This is when I explained to Mr. Nichols that Mr. Schefer was a member of the Club and that he can use the phone as long as he likes. However, I did not appreciate the way Mr. Schefer treated Mr. Nichols.

    On Thursday, June 1, 2000, I met with Mr. Schefer at the swimming pool where Tipo Lechheb was on duty as the lifeguard. I talked to him about what had occurred in the Club. I told him if he did something like that again I would have to take action against his membership. Mr. Schefer said that was fine because he would not be going into the Club again. Mr. Schefer only uses the swimming pool while he is at the Club.

    Then, yesterday June 5, 2000, I was at home when I received a call from an employee telling me that Mr. Nichols had Mr. Schefer arrested at the Club for "assault and battery". I would like to point out that Mr. Nichols never informed myself or Ms. Blackman or anyone else at the Club of his intent to arrest Mr. Schefer. Tom Cong was the manager on duty at the time of the incident. One final thing I would like to say is that at one time Mr. Nichols told me that he has a "propensity to sue people".

Sincerely,

Carlo Della Mea

EXHIBIT 1



*a higher level of fitness*

1800 Old Meadow Road, Unit H, McLean, Virginia 22102  (703) 556-6556  Fax (703) 893-8487

July 31, 2000

Fred Schefer
1727 Massachusetts Ave. N.W.
Washington D.C., 20036

Dear Mr. Schefer,

A second incident regarding the abuse of one of our employees at the pool has been reported to my office. This is the second incident of such abuse that has occurred in the last two months. Therefore, in accordance with our rules and regulations, we reluctantly terminate your membership. If you have any questions, please call me directly at my office @ 703-556-6556 ext 243.

Sincerely,

Pamela Curran
Regional Vice President
Sport & Health

Cc: Kevin Batters, General Manager, Hilton Hotel
    Carlo Della Mea, General Manager, Hilton Sport & Health



EXHIBIT 2

Alexandria • Annandale • Arlington • Ballston Common • Ballston Metro • Bethesda • Crystal Gateway • Crystal Park
Northwest • Regency • Rio • Rockville • Skyline • Tenley • Tysons • Washington Hilton • Watergate
White Oak • Woodbridge • Worldgate • Arlington Y Tennis & Squash Club

**Bethesda Sport & Health**

**Memo**

**To:** File

**From:** Dan Burns

**Date:** 8/11/02

**Cc:** Pam Curran

**Re:** Summary of meeting with Ron Nichols

---

On Friday, August 9, 2002 Pam Curran, Dan Burns, and Ron Nichols met to discuss a transfer for Mr. Nichols to the Watergate Hotel club. The meeting came about after several recent service issues involving members and guests of the Hilton Hotel club and the calling of security. Specifically, Mr. Edwards, the hotel General Manager, asked Paul Bernado to remove Mr. Nichols following an incident with Mr. Chris Biliski. Mr. Nichols called hotel security to remove Mr. Biliski although Mr. Biliski had a 5-day pass to the facility. Ms. Curran had previously informed Mr. Nichols that hotel security was not to be called on members or guests of the club unless there is clear and immediate danger to those in the facility.

Mr. Nichols was offered a transfer to the Watergate club with the same pay and number of hours. We also offered him the ability to choose another club to be transferred to if there was one more convenient for him than the Watergate. He was told that he could have until Monday, August 12, 2002 to give us his answer. Mr. Nichols was informed at this time that his employment would be terminated if these service issues continued.

After Ms. Curran left, Mr. Nichols and I spoke about the possible transfer. He indicated that he was "shocked" at what had happened. In response to my inquiry as to why he was shocked, he informed me that he felt like the situation had been handled with "class". He had anticipated being fired and felt the offer of a transfer was "generous". At this time, he informed me that he would like to accept the transfer to the Watergate club.

Mr. Nichols and Ronnie Meyers, General Manager of the Watergate club have a meeting set up for Monday, August 12, 2002. This meeting will be to make to set up a work schedule for Mr. Nichols.

EXHIBIT 3

● Page 1

# PERSONNEL RECORD

Nichols, Ron

Club Hilton    ID# 302-010

**Name** Ron Nichols
**Address** 1620 Fuller St, NW #402
**City and State** Washington, DC   **Phone No.** 2009
**Social Security No.** 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
**Marital Status** S ☒  M ☐  W ☐    **Date of Birth** 5/1/40    **Citizen** Yes ☒ No ☐   **No. of Dependents**   **Sex** M ☒ F ☐
**Date Employed** 7/19/97   **Department** Front Desk   **Starting Rate** $6.00
**Title**

| Date | Salary or Hourly Rate | Occupation | REASON FOR CHANGE | Authorized By |
|---|---|---|---|---|
| 7/19/97 | 6.00 | Desk | New Hire | gm |
| 5/30/97 | 6.30 | Desk | Minimum wage increase | gm |
| 7/18/98 | 6.60 | Desk | Increase | gm |
| 2/18/00 | $7.25 | | Increase | |
| 3/14/2001 | 7.75 | Front Desk | Increase | |
| 8-12-02 | " | " | Club Transfer Hilton & Watergate | |

| Date Left Employ | Reason For Leaving |
|---|---|

**EXHIBIT J**

## AFFIDAVIT

I, Jill Brown, hereby state as follows:

1. I am the Vice President, Human Resources of Sport & Health Clubs, Inc., located at the corporate office in Vienna, Virginia.

2. One aspect of my responsibilities is to oversee the preparation and maintenance of the personnel files for employees of the company. I am the individual who serves as the custodian of these files, including the personnel file of Ron Nichols.

3. With respect to Mr. Nichols, I attest that the documents attached to the Memorandum in Support of Sport & Health's Motion for Summary Judgment are true and accurate copies of documents maintained in the company file.

4. I also have reviewed the appropriate company files and can attest that there is no indication or evidence that Sport & Health ever declined to pay to Mr. Nichols a sales commission to which he was entitled or that he did not receive any membership sales credit due.

The foregoing is true and correct to the best of my information and belief.

_____
Jill Brown

Subscribed and sworn to before me this 31st day of March, 2006.

_____
Notary Public

My Commission Expires:

PAMELA M. EARLEY
Notary Public
Commonwealth of Virginia
My Commission Expires NOV 30, 2007

**EXHIBIT 5**

**MONUMENT**
R E A L T Y  L L C

Developing Solutions

1155 Connecticut Ave. NW 7th Floor Washington, DC 20036
202.777.2000  202.777.2020 FAX  www.monumentrealty.com

November 2, 2004

VIA Facsimile (703) 893-8487

Mr. Mitch Wald, CEO
Sport & Health Corporation
1953 Gallows Road
Vienna, VA 22182

Re: Lease Termination
MR Watergate LLC ("Landlord") and Washington Sport and Health, Inc. ("Tenant")

Dear Mitch;

On August 23, 2004 MR Watergate LLC ("Landlord") acquired the Watergate Hotel from BRE/Watergate L.L.C. and therefore assumed the role of Landlord referenced in those certain lease agreements dated August 2, 1993 ("Lease Ageement"), January 1, 2003 ("First Amendment"), May 1, 2003 ("Second Amendment") and October 1, 2003 ("Third Amendment").

Pursuant to the Third Amendment, the Landlord is exercising its right to terminate its lease agreement with Tenant within sixty (60) days of the date of this letter.

We look forward to having the opportunity to work with you in the future.

Sincerely,

MR Watergate LLC

*[signature]*

Name: Jeffrey T. Neal
Title: Authorized Signatory

**EXHIBIT 6**

## Interrogatories for Tom Cong

*I, Tom Cong, being duly sworn depose and state the following:*

*I am a person of lawful age and I am competent to testify to matters contained herein. I understand that this interview is being provided in connection with the Complainant's charge of discrimination, and I solemnly swear or affirm that the information provided in this interview is true to the best of my knowledge and belief.*

1. Please answer the following:
    - a.) Your full name:
      *Tom Cong*
    - b.) Your date of birth:
      *March 30, 1968*
    - c.) Your race:
      *Asian*
    - d.) Any disability you may have:
      *None that would affect my job functions at Sport & Health.*
    - e.) Your date of hire with Sport & Health:
      *July 19, 1995*
    - f.) Your position with Sport & Health:
      *Fitness Instructor and Personal Trainer.*
    - g.) Your end date with Sport & Health:
      *I am a current employee.*

2. When was Mr. Nichols hired?
   *I do not know the exact date of when the Club hired Mr. Nichols. However, it is my impression that he became an employee after I was hired. I was transferred to the Hilton Club in 1999 from the Regency Club.*

3. What was his position when hired?
   *Mr. Nichols was a part-time Front Desk Attendant.*

4. Please describe Mr. Nichols' duties.
   *Generally speaking, Mr. Nichols was tasked with answering phones, member check-in, giving instructions to the members as to the whereabouts of the facility, and providing members with assistance, as necessary.*

5. Were the same duties required of all other employees who held the same position as Mr. Nichols?
   *Yes, the same duties were required of all other Front Desk Attendants.*

6. Please describe Mr. Nichols' work performance.
   *Per my observations, Mr. Nichols performed his job as described the majority of the time. At times I would receive feedback from the Hotel guests and Club members as to his customer service. Mr. Nichols was satisfactory when answering the phones, but there had been times when members and customers commented that he would not treat them politely or courteously. As the Club's Fitness Director, I did not oversee Mr. Nichols directly. However, in the event that there was no other manager in the Club I would be the manager on duty and would supervise him.*


EXHIBIT 7

*Ron Nichols v. Sport & Health, Inc.*
Docket No.: 01-113-P (CN)
Interview Date: Thursday, May 27, 2004
Observed by Respondent's counsel, Mr. Leo Fisher and Mr. Robert Reverski

7. Please describe the Club's disciplinary policy.
   *If an employee were performing below satisfactory, a manager would communicate with the employee and provide the employee with the opportunity to improve his/her performance. All employee member complaints are kept in the employee's personnel file. The manager would follow up with the employee to check if he/she had made the required progress in his/her performance. Depending on what company policy an employee may have violated, he/she may receive a verbal or written warning. If not improvement has been made on the employee's part, then the employee would be terminated.*

8. Was Mr. Nichols ever disciplined? If so, how and what for?
   *It is my belief that Mr. Nichols' previous manager had had communication with him regarding his performance. However, I have no knowledge as to specific disciplinary actions that may have been taken against Mr. Nichols.*

9. Who else has been disciplined for the same infractions as Mr. Nichols?
   *I would say that it is on a regular basis that front desk staff get communicated to about improving their customer service.*

10. Please describe your working relationship with Mr. Nichols.
    *Mr. Nichols and my working relationship was ok for some time. My impression of Mr. Nichols was that he seemed to be unpredictable with respect to his behavior, and I discovered that I had to be very careful with any criticism I had about his work. Mr. Nichols tended to take things very personally and tended to overreact. He was unable to distinguish personal conversation from professional conversation, and his responses would at times be negative because he would take the criticism personally. For example, the Club has a courtesy phone located at the front desk. We do not have a clear policy as to how long a customer can occupy the phone. During one instance, Mr. Nichols rather impolitely told a customer to get off the courtesy phone because he felt the customer was taking too long with the phone. I feel that anyone who is in the Club has the right to be treated politely. I informed Mr. Nichols that there was no reason for him to be rigid about the customer's use of the phone especially since there was no one waiting to use the phone. Mr. Nichols responded negatively to this by taking my comment as I was insisting that he was wrong. I expressed to Mr. Nichols that he needed to be a little flexible under certain circumstances.*

11. Please explain your application procedures.
    *Advancement within the Club is based on communication. Employees would express to management their desire to move up within the Club they are employed at or request a transfer to a different position at another club.*

12. When did Mr. Nichols apply for any other positions?
    *I am not aware of Mr. Nichols having applied for or inquiring about a promotion to another position.*

13. When and why did the Club discontinue offering its management courses to employees?
    *I am not aware that they were or are currently discontinued.*

*Ron Nichols v. Sport & Health, Inc.*
Docket No.: 01-113-P (CN)
Interview Date: Thursday, May 27, 2004
Observed by Respondent's counsel, Mr. Leo Fisher and Mr. Robert Reverski

14. Who was allowed to receive sales commissions during the 1999-2000 time period?
    *I am not entirely certain. I believe Mr. Nichols was given the opportunity to consult members on selling.*

15. Please describe the altercation that ensued between yourself and Mr. Nichols.
    *We have our limited space in the Club, and I share my office with the Assistant Manager and fitness staff. In this office we had a closed that housed fitness equipment. The Club's policy was that employees were not to store things in that closet. No exceptions. The Club provided employees with the option to store their belongings in lockers. Mr. Nichols did not make use of this option, and would store his belongings in the closet. I had asked him several times to relocate his belongings to a locker to no avail.*

    *During the particular time being referenced, I was performing a club assessment with a member. I took Mr. Nichols belongings from the closet to the front desk and asked him to relocate them to a locker. Mr. Nichols refused to do such and tried to place his things back into the closet. I indicated to him that the closet had limited space and showed him why the employees should not store items there. At this point he was standing by my side and he closed the closet door very hard on my head. I looked at Mr. Nichols and told him that he should not have done that. I remember him saying, "Oh, does that hurt?"*

    *During the club assessment, Mr. Nichols would repeatedly come into the office to say things to me to the point where I had to lock the door in order to prevent him from interrupting the assessment again. The only physical contact between Mr. Nichols and myself was possibly a touching of hands when I was holding his belongings and he was trying to take them away from me. However, I did not actively grab him or attack him. I understand that he filed a workman's compensation claim claiming that his finger was hurt. I guess that may have happened during the process when he was trying to gain possession of his things, which I was holding. I do not know if the claim was approved.*

    *I had a conversation with the General Manager pertaining to the incident, but I did not file a written report of this case. It was a situation that I believed was very simple of my explaining the Club's policy to Mr. Nichols, which I did not feel needed to be recorded. Mr. Nichols expressed physical violence, and I countered it by using good judgment. The fault lies with Mr. Nichols. I did make a phone call to his home after that incident. I cannot remember what I had said exactly, but I did express to him that I was against physical violence and that I was capable of defending myself. Although I had not used physical force when he attacked me, I expressed that I reserved the right to use that force if other similar circumstances arose. The police were not called on this matter.*

16. Please describe the selection criteria for the Club's "Above and Beyond" award and the "Employee of the Year" award.
    *The "Above and Beyond" award is mostly voted by members, as I believe the "Employee of the Year" award was. It was all an anonymous voting process. I am not aware if Mr. Nichols received any of these awards.*

17. Please explain why Mr. Nichols was transferred.
    *I was at the Club when Mr. Nichols was transferred, however I do not know why he was transferred. I also do not know whether or not the transfer was voluntary.*

3

*Ron Nichols v. Sport & Health, Inc.*
Docket No.: 01-113-P (CN)
Interview Date: Thursday, May 27, 2004
Observed by Respondent's counsel, Mr. Leo Fisher and Mr. Robert Reverski

I, ___Tom Cong___, having read the above, state that the responses contained herein are true and correct to the best of my knowledge and belief.

_____
Tom Cong

___09/09/04___
Date

4

## Interrogatories for Paul V. Barnedo

*I, Paul V. Barnedo, being duly sworn depose and state the following:*

*I am a person of lawful age and I am competent to testify to matters contained herein. I understand that this interview is being provided in connection with the Complainant's charge of discrimination, and I solemnly swear or affirm that the information provided in this interview is true to the best of my knowledge and belief.*

1. Please answer the following:
    a.) Your full name:
        *Paul Vincent Barnedo*
    b.) Your date of birth:
        *July 19, 1975*
    c.) Your race:
        *Philippino*
    d.) Any disability you may have:
        *None that would affect my job functions at Sport & Health.*
    e.) Your date of hire with Sport & Health:
        *Sport & Health hired me on April 2, 1997. However, I began working for the Club located at the Hilton Hotel in July 2001.*
    f.) Your position with Sport & Health:
        *General Manager*
    g.) Your end date with Sport & Health:
        *I am a current employee.*

2. When was Mr. Nichols hired?
    *I am not certain of the exact date Mr. Nichols was hired, but the Club employed him before I was transferred to work there.*

3. What was his position when hired?
    *Mr. Nichols was a Front Desk Attendant.*

4. Please describe Mr. Nichols' duties.
    *Generally speaking, Mr. Nichols answered the phones, checked in members and performed transactions. Mr. Nichols is a part-time employee.*

5. Were the same duties required of all other employees who held the same position as Mr. Nichols?
    *Yes, the same duties were required of all other Front Desk Attendants.*

6. Please describe Mr. Nichols' work performance.
    *I would describe Mr. Nichols' work performance as satisfactory.*

7. Please describe the Club's disciplinary policy.
    *Generally speaking, there would first be a verbal warning that is documented in the employee's personnel file, followed by written warnings.*


EXHIBIT 8

Ron Nicholson v. Sport & Health Inc.
Docket No.: 01-113-P (CN)
Interview Date: Thursday, May 27, 2004
Observed by Respondent's counsel, Mr. Leo Fisher and Mr. Robert Reverski

off on voting on who was to receive the award in order to wait for Mr. Parks to fulfill his sixth month as an employee at the Club.

16. Please describe the incident involving Mr. Nichols and member, Carry Chavis.
    I cannot recall such an incident.

17. Please describe the incident involving Mr. Nichols and member, Chris Bilski.
    The member name does sound familiar, but I cannot recall the incident at this time.

18. Please explain why Mr. Nichols was transferred.
    Mr. Nichols was transferred to the Watergate Hotel Club because of the performance issues that had occurred with Ms. Bailey, as well as issues that had arisen during his tenure prior to my becoming General Manager of the Club. I am not certain as to the specifics of those issues. The Club's Regional Manager, Dan Burns (Caucasian/mid-30's) is the individual who made the decision to transfer Mr. Nichols to the Club at the Watergate. I had made Mr. Burns aware of the written warnings I had issued Mr. Nichols at the time of issuance. I was not involved in the actual meeting between Mr. Burns and Mr. Nichols concerning Mr. Nichols' transfer. To my knowledge, Mr. Nichols was transferred to a bilateral position that received the same pay rate and hours. I do not know of any other employee who was transferred during my tenure with the Hilton.

19. When and by who were you informed that Mr. Nichols had filed a discrimination complaint with the D.C. Office of Human Rights?
    Mr. Burns made me aware that Mr. Nichols had filed a discrimination complaint with the D.C. Office of Human Rights upon the commencement of my employment as General Manager at the Hilton, though I was not informed of the specifics. I have no knowledge on whether other employees have filed discrimination complaints against the Club.

I, _Paul Barnedo_, having read the above, state that the responses contained herein are true and correct to the best of my knowledge and belief.

_Paul Barnedo_
Paul V. Barnedo

8/31/04
Date

3

## Interrogatories for Cicily S. Blackman

*I, Cicily S. Blackman, being duly sworn depose and state the following:*

*I am a person of lawful age and I am competent to testify to matters contained herein. I understand that this interview is being provided in connection with the Complainant's charge of discrimination, and I solemnly swear or affirm that the information provided in this interview is true to the best of my knowledge and belief.*

1. Please answer the following:
    - a.) Your full name:
      *Cicily Shamaine Blackman*
    - b.) Your date of birth:
      *May 5, 1974*
    - c.) Your race:
      *Black*
    - d.) Any disability you may have:
      *None that would affect my job functions at Sport & Health.*
    - e.) Your date of hire with Sport & Health:
      *February 19, 1997*
    - f.) Your position with Sport & Health:
      *Assistant Manager*
    - g.) Your end date with Sport & Health:
      *I am a current employee at a different location.*

2. When was Mr. Nichols hired?
   *I believe Mr. Nichols was hired about six to eight months after I was hired at the Club.*

3. What was his position when hired?
   *Mr. Nichols was a Front Desk Attendant who worked part-time.*

4. Please describe Mr. Nichols' duties.
   *Generally speaking, Mr. Nichols would greet customers, check customers into the Club, sell merchandise, process guest fees, and reconcile daily paperwork for his shift.*

5. Were the same duties required of all other employees who held the same position as Mr. Nichols?
   *Yes, the same duties were required of all other Front Desk Attendants.*

6. Please describe Mr. Nichols' work performance.
   *Mr. Nichols was an employee who performed what was required of him and who was always on time.*

7. Please describe the Club's disciplinary policy.
   *Generally speaking, an employee whose actions were those that went against Club policy would first be verbally warned. If the employee committed the same or different infraction that went against Club policy s/he would be issued a written notice.*



EXHIBIT 9

Case 1:05-cv-01978-JR   Document 18-2   Filed 03/31/2006   Page 14 of 20

Ron Nichols v. Sport & Health, Inc.
Docket No.: 01-113-P (CN)
Interview Date: Thursday, May 27, 2004
Observed by Respondent's counsel, Mr. Leo Fisher and Mr. Robert Reverski

8. Was Mr. Nichols ever disciplined? If so, how and what for?
   *Yes, Mr. Nichols was disciplined within the first year he was employed at the Club. I recall that I personally verbally counseled him on several occasions, as I did other employees, for handling cash transactions incorrectly, customer service, and for how he handled different situations with employees and customers. For example, Mr. Nichols would not use his own judgment with respect to putting the customer first. It was always his way. If a hotel guest forgot his/her key or if a member did not have his/her receipt or card, he would not take the customer's word or go above and beyond to make sure that the customer was in fact allowed to make use of the Club. There was probably one instance when I documented a counseling in writing, but I cannot recall specifically at this time. I believe Mr. Carlo Della Mea, General Manager of the Club, also disciplined Mr. Nichols, though I do not know the specifics.*

9. Who else has been disciplined for the same infractions as Mr. Nichols?
   *Front Desk Attendants, as well as other Club employees, were also disciplined for the same infractions as Mr. Nichols.*

10. Please describe your working relationship with Mr. Nichols.
    *Mr. Nichols and I had a strictly professional working relationship in which him and I worked well together.*

11. Please explain your application procedures.
    *Generally speaking, an employee would place a request for a promotion or job transfer with the Club's General Manager.*

12. When did Mr. Nichols apply for any other positions?
    *Mr. Nichols did not apply for any positions other than Front Desk Attendant with the Club, nor did he mention to me that he would like to be Assistant Manager of the Club.*

13. How did you advertise for the position of Assistant Manager?
    *I do not know how the position of Assistant Manager was advertised for after I left the Club. I do know that when I had become Assistant Manager at the Hilton I had inquired about the position through the General Manager.*

14. When and why did the Club discontinue offering its management courses to employees?
    *I am not certain as to when or why the Club's management courses were discontinued. I do know that Mr. Nichols did attend a few of the courses when they were being offered.*

15. Who was allowed to receive sales commissions during the 1999-2000 time period?
    *Any employee who was trained in selling a membership and sold a membership received a sales commission. It was normal practice to train the Front Desk Attendants in selling memberships. I do recall that Mr. Nichols was trained to sell memberships and did received commissions for selling memberships at the Club.*

16. Why did you have Mr. Nichols carry the towel bins on one occasion?
    *I do not recall the occasion. However, employees were asked on occasion to perform housekeeping duties, such as picking up towels in the fitness center. I was never made aware of any disability Mr. Nichols may have had.*

2

Case 1:05-cv-01978-JR   Document 18-2   Filed 03/31/2006   Page 15 of 20

*Ron Nichols v. Sport & Health, Inc.*
Docket No.: 01-113-P (CN)
Interview Date: Thursday, May 27, 2004
Observed by Respondent's counsel, Mr. Leo Fisher and Mr. Robert Reverski

17. Please describe the incident with former Club member, Fred Scheffer.
    *I can recount the incident as it was told to me because I was not physically present when it occurred. The General Manager, as well as other employees, told me about the incident. Apparently, Mr. Scheffer spoke some racial slurs to Mr. Nichols. Mr. Scheffer's Club membership was terminated as a result of that incident a couple of weeks later.*

18. Please describe the Club's policy with respect to where employees should store their belongings.
    *Employees can utilize a locker to store their belongings, which is an option made available to all employees. Employees used the lockers in the men and women's locker rooms. Employees were not to store their belongings in the lobby area. I am not familiar with an incident regarding Mr. Tom Cong and Mr. Nichols with respect to Mr. Cong not wanting Mr. Nichols to store his belongings in a lobby office. I did not receive any direct complaints from Mr. Nichols about Mr. Cong. Mr. Nichols did document his complaints to myself and Mr. Della Mea by way of memo, and we would verbally respond to his concerns.*

19. Please describe the selection criteria for the Club's "Above and Beyond" award and the "Employee of the Year" award.
    *I am not certain about the selection criteria for the "Above and Beyond" award. As for the "Employee of the Year" award, the employees would vote on who should receive the award and the General Manager would make the final decision. An employee had to be employed with the Club at least six months before becoming eligible to receive the award. I do not know an employee by the name Jesse Parks.*

20. Please explain why Mr. Nichols was transferred from the Club at the Hilton to the Club at the Watergate Hotel.
    *I have no knowledge on why Mr. Nichols was transferred. I ceased to work at the Hilton in 2001, and was not there for when the transfer occurred.*

I, _Cicily Blackman_, having read the above, state that the responses contained herein are true and correct to the best of my knowledge and belief.

_Cicily S. Blackman_
Cicily S. Blackman

8/27/04
Date

3

**SPORT & HEALTH, INC.**
1800 Old Meadow Road   Unit H
McLEAN, VIRGINIA 22102
**(703) 556-6556**

# APPLICATION FOR EMPLOYMENT

NOTE: If you require more space than provided, please attach separate sheet(s).

## PERSONAL

| | |
|---|---|
| NAME | Ron Nichols |
| STREET | 1620 Fuller Street NW apt 402 / Washington |
| STATE | DC |
| ZIP | 20009 |
| SOCIAL SECURITY NUMBER | 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 |
| HOME PHONE | 202-462-1980 |
| BEST TIME TO CALL | |
| BUSINESS PHONE | |
| BEST TIME TO CALL | |

| | |
|---|---|
| TODAY'S DATE | July 9, 1997 |
| REFERRED BY | Advertise |
| APPLYING FOR: | ☐ FULL TIME  ☒ PART TIME  ☐ TEMPORARY |

## EDUCATION

| | NAME AND LOCATION | FROM | TO | CURRICULUM | MAJOR | DEGREE | DATE GRADUATED |
|---|---|---|---|---|---|---|---|
| HIGH SCHOOL | Othello H.S. | 1958 | 1959 | College | | | '59 |
| COLLEGE | | | | | | | |
| OTHER | | | | | | | |

## SPECIAL SKILLS OR TRAINING (That May Qualify You For Work With Our Company)

CERTIFICATIONS OR SPECIAL TRAINING:

HAVE YOU EVER BEEN CONVICTED OF A FELONY?  ☐ YES  ☒ NO

REFERRED TO SPORT & HEALTH BY: Self

HAVE YOU EVER BEEN EMPLOYED BY SPORT & HEALTH?  ☐ YES  ☒ NO

## EMPLOYMENT (Start With Most Recent)

| FROM | TO | EMPLOYER | PHONE | CITY, STATE |
|---|---|---|---|---|
| 1992 | 1997 | Howard University | ( ) | |
| JOB TITLE | College Assistant | DUTIES | as required | |
| SUPERVISOR'S NAME | | | | |
| STARTING SALARY WAGES | | | | |
| FINAL SALARY WAGES | | REASON FOR LEAVING | | |

| FROM | TO | EMPLOYER | PHONE | CITY, STATE |
|---|---|---|---|---|
| | | Pls see resume | ( ) | |
| JOB TITLE | | DUTIES | | |
| SUPERVISOR'S NAME | | | | |
| STARTING SALARY WAGES | | | | |
| FINAL SALARY WAGES | | REASON FOR LEAVING | | |

EXHIBIT 10

| POSITION(S) DESIRED |
|---|
| weekend + mornings part-time |

| HOURS · DAYS AVAILABLE |
|---|
|  |

## U.S. MILITARY RECORD

| BRANCH OF SERVICE | FROM | TO | DUTIES | DISCHARGE DATE |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |

## REFERENCES

| NAME | ADDRESS | YEARS KNOWN |
|---|---|---|
| Pls see resume |  |  |
|  |  |  |

### APPLICANT'S STATEMENT

I certify that statements made by me on this form are true and correct. I understand that if employed, any false statement on this application can be considered cause for dismissal. I authorize investigation of all statements contained in this application for employment as may be necessary in arriving at an employment decision.

Signature [signed]  7-9-97         Date _____

DO NOT WRITE BELOW THIS LINE

## PERSONNEL ACTION

REMARKS

This Application for Employment is prepared for general use throughout the United States. NEBS assumes no responsibility for the inclusion in this form of any questions which, when asked by the Employer, may violate state and/or Federal Law.

PRODUCT 5051  NEBS, Inc. Groton Mass 01471  To Order PHONE TOLL FREE 1 + 800 225 6380 (Mass residents 1 + 800 252 9226)

TO:        GENERAL MANAGER

FROM:    NANCY TERRY

DATE:    OCTOBER 22, 2001

SUBJECT:  ABOVE AND BEYOND

Enclosed are your materials for the Above & Beyond Employee Recognition Program. You will find:

1. Lead box insert
2. Ballots
3. Poster
4. Flyers for employees (English and a Spanish version)

Encourage all of your department heads to get involved in asking members and staff to submit their stories to recognize the employees that have provided outstanding member service. You may want to designate a bulletin board in the club to display the ballots as they come in. Also, make a copy of the ballot to send to the "recognized" employee with a note of thanks. Trade with your local restaurants or movie theater for prizes for the two winners.

When you determine your winners the first week of December, please fax this completed form to me and we will customize a poster for your club to display at the front desk and provide a certificate for you to give to your winners. Please call me if you have any other questions.

## WINNERS FORM

Club Name: _____

Full-time employee winner: (please print neatly)

Name _____

Department_____


Part-time employee winner: (please print neatly)

Name _____

Department _____

EXHIBIT 11

## Above and Beyond Recognition Ballot

We are accepting nominations from our members and staff for the "Above and Beyond" Employee Recognition Program. The purpose of the program is to recognize and award those individuals that go above and beyond their job description and to honor their personal success as it contributes to the Sport & Health mission. It is our mission to "enroll individuals to be healthy and active for a lifetime by providing outstanding service and the finest in health, recreation and sporting facilities while growing profitably." **All ballots must be received by November 30 and the winners will be announced the first week in December.**

I nominate _____

Department (check one)  ☐ Housekeeping   ☐ Kids' Klub/Nursery   ☐ Aquatics   ☐ Front Desk
☐ Group Exercise   ☐ Racquet Sports   ☐ Fitness   ☐ Serenity Spa   ☐ Other_____

For the following reasons: _____

_____
_____
_____
_____

Submitted by _____     ☐ Member   ☐ Staff   ☐ MOD
Date _____
(return to the ballot box or front desk)

## Above and Beyond Recognition Ballot

We are accepting nominations from our members and staff for the "Above and Beyond" Employee Recognition Program. The purpose of the program is to recognize and award those individuals that go above and beyond their job description and to honor their personal success as it contributes to the Sport & Health mission. It is our mission to "enroll individuals to be healthy and active for a lifetime by providing outstanding service and the finest in health, recreation and sporting facilities while growing profitably." **All ballots must be received by November 30 and the winners will be announced the first week in December.**

I nominate _____

Department (check one)  ☐ Housekeeping   ☐ Kids' Klub/Nursery   ☐ Aquatics   ☐ Front Desk
☐ Group Exercise   ☐ Racquet Sports   ☐ Fitness   ☐ Serenity Spa   ☐ Other_____

For the following reasons: _____

_____
_____
_____
_____

Submitted by _____     ☐ Member   ☐ Staff   ☐ MOD
Date _____
(return to the ballot box or front desk)

# ABOVE & BEYOND
## EMPLOYEE RECOGNITION PROGRAM

This November, we are hosting the second annual "Above & Beyond" Employee Recognition Program where you and our members will have a chance to recognize the employees that go above and beyond the call of duty in providing outstanding member service, supporting the team and performing beyond your normal everyday job responsibilities.

During this program we will recognize the employees and their personal successes that contribute to the Sport and Health mission of *"enrolling individuals to be healthy and active for a lifetime by providing outstanding service and the finest in health, recreation and sporting facilities while growing profitably."*

*You may recognize employees that demonstrate these principles:*
1. Ownership and Accountability
2. Providing Extraordinary Service
3. Sales Driven
4. Responsive to Members' Needs
5. Relentless Attention to Detail
6. Respect and Caring for the Individual
7. Passionate about Health and Fitness



Sport & Health™ Clubs

Just complete the ballot and return it to the box at the front desk during November. During the first week of December, we will select the two winners.