

2000 N. 14th Street, #100
Arlington, VA 22201
Voice: (703) 525-4000 Ext: 312
Fax: (703) 525-2207
cdowling@beankinney.com

**MEMORANDUM**

TO: Club Mangers
SPORT & HEALTH

FROM: BEAN, KINNEY & KORMAN, PC

DATE: September 19, 2000

RE: EMPLOYMENT DISCRIMINATION AWAERNESS MEETING

---

I. SPORT & HEALTH'S EEOC POLICY– Review language

| | |
|---|---|
| Race | Marital status |
| Color | Sexual Orientation |
| National Origin | Matriculation |
| Sex | Political Affiliation |
| Age | Veteran Status |
| Religion | Physical or Mental Disability |

A. Prohibited Practices

1. Disparate Treatment/Adverse Employment Actions based upon protected status--Does not have to rise to level of firing or demotion

   A. Constructive Termination

   B. Excessive Monitoring/Discipline

   C. Reduced Responsibility

1


Plaintiff's Exhibit #35

      D.    Compensation–Employees can negotiate for different salaries, document why someone's is higher or lower than other similarly situated employees

  2.    Harassment

  3.    Retaliation

B.    Open Door Policy

  1.    Talk about it with staff–long before there is a problem

  2.    Make sure every employee reads the handbook and that you have signed certification in your file

  3.    Make sure your people know who they can report to and that every supervisor knows to report any allegations to you

  4.    Having a policy that is easy to use and encouraged can be a defense to later claims if employee failed to use the system

C.    Reporting Up

  1.    Make sure that supervisors know that they should let you know what employees have complained about–don't be "unavailable"

  2.    Make sure you report serious concerns to your supervisor and/or to the Human Resources Director

  3.    Let your staff and supervisors know that you take this seriously and want to hear about concerns.

  4.    Don't let it linger and hope it will go away!!! This is the _worst_ thing you can do!

II. Investigating

    A. How far do you take it?

        1. Use your discretion—you are a manager

        2. No matter how trivial it may seem to you, don't dismiss concerns without following up

        3. At the very least make sure that employee knows you are aware and want to do the right thing and that the complaint is taken seriously

        4. Close the loop with the complainant no matter how far the claim goes

    B. Who talks to whom?

        1. Who will do the investigation?

        2. Speak to the complaining party—consider gender and racial sensitivities when choosing who will do the interviewing

        3. Keep inquiry confidential—but investigate to the extent necessary

        4. Address concerns with alleged harasser/discriminator when you have facts

    C. What's in the record

        1. Make sure you document your investigation

        2. Make a final report, regardless of what you determine

        3. Do reach a final conclusion

        4. Contact counsel/head office as soon as possible if there is reason to believe that harassment has occurred or an official report has been filed

    D. Take Action—You have options of how to react to discriminatory/harassing behavior

1. Reminder to all staff of policies and how to be sensitive to co-workers
2. Require written apology from harasser/offender
3. Give Reprimand/Make note in offender's record of reprimand
4. Give notice to guilty party and all staff that behavior will not be tolerated
5. Don't transfer the complaining party unless they have specifically requested that remedy
6. Terminate offender
7. Follow your procedures–Review the manual and have your supervisors review it
8. Continue to follow up with complaining party for extended period of time to make sure situation has been remedied

III  Termination–It all comes out in the end.

A. Make sure your records support your decisions

B. Even if a claim is legitimate, it may only be brought up at the time of termination if the employee has not felt free to express it, and then it is too late to address it. Therefore encouraging reporting so that you have a chance to remedy the situation and avoids claims.

C. Offenders need to be terminated if problem is serious and/or persists–but be aware that an offender may him or herself be in a protected class–documentation is key!!

*REMINDER: Hearing about a harassment or discrimination claim in your club is not the worst thing that can happen. Once you hear about it, you can address the problem, stop the behavior, and protect yourself and the company. The worst thing is not hearing about it. The longer a concern goes unaddressed, the more difficult it will be to resolve.*

*Hilton*

Memorandum

To: ALL DEPARTMENT HEADS

From: Richard J. French   Date: 2/6/98

Location: Washington Hilton & Towers

Dept: Executive Office

Subject: SPORT AND HEALTH CLUB

Please join me in welcoming Carlo DellaMea as the new Manager at the Sport and Health Club effective this week. Carlo has been with Sport and Health for five years, and most recently at Mt. Vernon College.

Please extend your usual cooperation as Carlo assumes his new responsibilities and wish him success here at the Washington Hilton.

ST-10

Plantiff's Exhibit # 36

To: Paul Barnedo, Hilton Sport & Health Club [S/H]
    Manager

From: Ron Nichols, Manager on Duty [MOD] Notes

Page 1 of 2

Date: Friday, January 18, 2002

Subject: Front Desk [FD] Policy

    Thank you for responding to my request for more MOD work time to start in February 2002. If possible, could you please ask those employees working FD on my MOD shifts to please wear reasonably proper S/H uniform, with nametags. This includes a S/H shirt/or a S/H embossed upper garment with proper color pants. It may seem like a small thing, but we wear uniforms for business reasons and to better carry out the functions of our jobs. Please imagine, police and soldiers running around in street clothes; that would be chaotic, confusing, and threatening.

    I had to ask Malcolm Norman if he knew he was going to work tonight for Jesse Parker based on what he first came to the FD wearing. Fortunately I found under your desk a S/H sweatshirt, which I had him put on to work. Maybe, because some FD people don't look/act like they work here, might be a partial reason we can't collect guest and tennis fees as we should. This is no small point because, when the courts and pool reopen, the <u>FD person may have go outside in the dark</u> from time to time to request fees be paid from someone who has neglected to pay charges. Wearing proper S/H attire is a benefit to fee collection, and avoids unnecessary anxiety when approaching some people.

    Another reason fees may not be collected is that, incoming people are not immediately informed that to use the Club requires payment. Mr. John Moore, one of the former S/H Managers, had an effective way of assuring this immediate notice even if a person went directly into the bathroom, before coming to the FD. John would have the FD person (in proper uniform) walk into the bathroom and began washing his hands at the sink and discreetly ask if the person was staying in the Hotel. If so, then the FD person would tell the prospective client the charges and invite the person to come to the FD to sign in. Of course, you need a FD that's aware, alert and caring enough to carry out surveillance of the three entrance/exits to the Club.

    I give the above bathroom example, because tonight about 5:49PM, a person in his mid-twenties came into the Club from the Hotel, and went directly into the men's room. He wore a pea coat, had a Marriott backpack, long dreadlocks. He stood about 5'11." After 30 seconds, I went into the men's room and observed him opening the door in back of the dressing area and looking inside the massage room. I asked the young man if he were staying in the Hotel, to which he gave me a non-committal answer. I asked him to go first to the FD. He went to the FD and briefly spoke to Jesse, then went

Plaintiff's Exhibit #37

RonNichols/MOD notes, 1-18-02, PAGE 2

into the Club, shortly returning to the men's room. I followed. There again, he opened the massage room door, and then went to the Housekeeping utility closet, the door of which was locked. In the meantime, I had conferred with Jesse about the situation. I then informed the young man he'd have to be a registered guest of the Hotel to use facilities. After some hesitation on his part, he then left the Club through the Hotel entrance. I then informed Hotel security, which said, they were aware of the gentleman, and if there were any problems, call security again. I also called you, Paul, to advise you of the situation.

Also, I had to ask Malcolm tonight not to turn off the FD CPU before posted closing time, and not to turn off the gym lights as long as we have clientele in the Club.



Plaintiff's Exhibit # 37

To: Carlo DellaMea, Washington Hilton Sport & Health Club [S/H] Manager

From: Ron Nichols, Manager on Duty [MOD]

Date: May 29, 2001

Subject: Differential Treatment

    Carlo, in my memo to you dated 4-20-01, I informed you of new employee Kelly Jupiter's (who has the traditional 5:00 to 10:30PM Friday Front Desk shift) habits of arriving late and taking long dinner breaks on the clock. Since that memo, Ms. Jupiter continues to arrive late for her Friday evening shift, if she comes at all. On 5-4-01, Kelly did not come to work. On 5-11-01, Kelly came to work without her S/H uniform or wearing her name tag. On 5-18-01, Kelly did not report to work at all. On 5-25-01, according to Kiri Kirscher, Ms. Jupiter called to say, she could not come into work that evening. It was raining. The same rain was falling on me, but I arrived to work at 5:00PM. Kelly arrived at 6:17 after the rain stopped. Later that evening at 8:30PM, Kelly asked me, if she could take the rest of the evening off, because an associate of hers had come to see her on the job. It appears that employees on my MOD shifts are encouraged and/or allowed not to come to work and still continue to be carried as S/H employees, and with no penalties.

    I have asked you several times in the past to be paid a differential, because of instances like the above where employees scheduled to work concurrently with my MOD shift do not show up to work. I am asking again for this pay differential. When I ask you about employee work habits like those of Ms. Jupiter described above, you say to me that you cannot find reliable employees.

    You also informed me you were not going to fill the Assistant Manager slot whenever I expressed my interest in promotion and in that position.

CC: Ms. Pam Curran, Sport & Health Vice Presdent
    1800 Old Meadow Road, Unit H
    McLean, Virginia 22102        CERTIFIED MAIL

Plaintiff's Exhibit #38



# SPORT & HEALTH Inc.™

1919 Connecticut Avenue, N.W. • Washington, D.C. 20009 • (202) 483-4100

To:       Ron Nichols

From:     Carlo Della Mea

Date:     September 1, 2000

Subject:  MOD Notes for August 19, 2000

    Pam Curran wanted to let you know that she received your letter with the subject MOD Notes for August 19, 2000. She would like to sit down with you and me and go over the letter together.

    However, Pam is away at the U.S. Open and I will be on vacation next week in Canada. We are hoping to meet with you the week of September 11th. Thank you.

Plaintiff's Exhibit #39

*Sport & Health Clubs:* Tenley • Bethesda • Regency • Devil's Reach • Rio • Arlington Y Tennis & Squash Club • Washington Hilton
*Sport & Health Centers:* Annandale • Arlington • Ballston • Rock • Springfield • White Oak

To: Carlo DellaMea/Cicily Blackman, Hilton Sport & Health Club [S/H]
     Managers

From: Ron Nichols, Front Desk [FD], Date: March 4, 2001

Subject: Tom Cong's operation of the FD

    This is to put in writing some of my voiced complaints concerning Tom Cong's performance at the FD during my shift work.

(1) Tom does not always relieve me for lunch on Sunday. Therefore, there are Sunday shifts during which I have no lunch relief. (2) On 2-25-01 Mr. Cong accepted charge slips without clear and legitimate documentation as to what specific parties these Hotel charges were to be assigned. (Charge slip copies attached).

(3) Furthermore, during the time Tom relieves me for my lunch break, I've observed Tom inside the S/H management office with that door closed. The FD is then not manned, and it would be impossible to be immediately aware of who comes and goes at the S/H 19th Street entrance, near the S/H ladies room and merchandise rack. The merchandise rack is not protected.

(4) At least three hand-held calculators are on desks and/or available for use in S/H. <u>Tom seems to prefer removing FD calculator</u> from the FD, not to return same. Meanwhile, the FD must do without the benefit of calculator, or put Hotel and/or other guests on hold, while a suitable substitute is gotten.

    Issues #2, #3, and #4, respectively, above leave potential for adverse involvement with the Hotel, by #2 exposing Hotel guests to unnecessary contact and questioning. In issue #2, on February 25, 2001, four separate names were registered to Hilton room 9205 [Harris, Michael; Milstein, Barry; Ratner, Eric; and Knapp, Michael]. At the instance of two of these gentlemen arriving from room 9205 at S/H, Tom did not inquire their names nor commit to writing their identities for proper assignment of S/H charges.

    Anyone familiar with the Hilton S/H 19th Street entrance can clearly recognize #3's vulnerability to person and property caused by the negligence of a FD person withdrawing and cutting one's self off from the FD post at the door's entrance. Issue #4 opens unnecessary wait times for Club clientele wishing to use S/H facilities, and buy merchandise.

    The above incidents to an outside novice may seem trivial and trite. However, these situations represent potential kernels for FD stress and mal-involvement with S/H and Hilton clientele. During S/H's peak operating season, these types of encounters lead to serious complaints, as has happened in the past. Carlo/Cicily could you please bring these matters to Tom Cong's attention, and if possible please provide Tom with training to overcome these discrepancies.

Above-mentioned attachments: Hilton Miscellaneous Charge Slips

*[handwritten: not included]*

*[handwritten stamp: PLAINTIFF's EXHIBIT #40]*

To: Carlo DellaMea/Cicily Blackman, Hilton Sport & Health Club [S/H]
    Managers

From: Ron Nichols, Front Desk [FD], Date: March 8, 2001

Subject: Tom Cong's Retaliation for Memo dated 3-4-01 and delivered to you 3-6-01

      Please find the <u>Worker's Compensation claim</u> generated on 3-7-01, when Physical Instructor, Tom Cong pushed and twisted back the fingers of my right hand @ 7:45PM in retaliation for my memorandum you received on 3-6-01, concerning Tom's poor performance on my workshift at the FD.

      The George Washington Hospital Emergency Office (GWH) has asked me to give you the attached Work Limitation Form and billing information. Should you have any questions about GHW billing, please contact Mr. Smith at (202) 715-5315.

      Mr. Paul Smith, Supervisor
      George Washington University Medial Center
      Department of Emergency Medicine
      901 23rd Street, NW; Washington, DC; 20037

Above-mentioned attachments: *not included*


Plaintiff's Exhibit #41

To: Carlo DellaMea, Washington Hilton Sport & Health Club [S/H] Manager

From: Ron Nichols, Front Desk [FD], Date: April 22, 2001

Subject: Tom Cong's Interference with my Work at the FD

We here at Hilton are at the start of the Club's high season with the corresponding high stress. On Sunday, April 22, 2001, around 4:20PM, Tom Cong again interfered and harassed me at the FD. On March 4, after Tom had assaulted me by bending the fingers back on my right hand, Tom agreed to relieve me for lunch at approximately 5PM Sundays. But last Sunday (April 15th), Tom directed me to go to lunch at 4PM. Because of Tom's agreement to relieve me at 5PM, I've prepared myself for that time.

When I informed Tom of his agreement to relieve me at approximately 5PM on Sundays, Tom said he did not remember his promise. I believe, that FD work requires flexibility and focus. The time 5PM is not necessarily written in stone, however, it is unhealthy and unnecessary to eat 2 full meals in less than 2 ½ hours (medically it takes nearly 2hrs to digest a meal). When I informed Tom of the stupidity of eating 2 full meals in 2 ½ hours, Tom began a tirade standing over me at the FD, saying that I was about to be fired by Sport & Health Club because upper management (Corporate?), did not like, and had it in for me. That furthermore, Sport & Health had vindicated Tom for his assault on me and even had rewarded him with a large raise recently. "Ron," Tom said, "S/H doesn't care about you at all." Tom continued along with these pronouncements, when I got up from the FD and walked away. I don't like to leave my post unnecessarily, but I don't think I should be harassed by such petty/negative conduct.

Tom continued this type of verbal interference with my FD duties till around 4:40PM, when the attached group of walk-ins interested in membership began to enter the Club looking for information. I had been harangue by Tom for nearly 20 minutes and this harassment was not helping my disposition, which I needed the best of to sell memberships. In general, I do not say anything to Tom when he is performing his duties, and I certainly don't say anything untoward to him.

Tom has gone back to his old habits when he relieves me at the FD of not watching the store, so to speak. This evening when Tom relieved me a woman guest, I. Sinclair, from the Hoftel walked into the Club and began using the equipment without being challenged by Tom. During part of Tom's early harang, Tom said, he did not like to sit at the FD when he relieved me for lunch. Every week, last week included--someone who hasn't paid has entered the Club and used the equipment while Tom was relieving me at the FD.



Plaintiff's Exhibit #42

1620 Fuller Street NW, #402
Washington, DC 20009
December 11, 2001

Mr. Haydn G. DeMas
Human Rights Department
441 4th. Street NW, 570N
Washington, DC 20001

RE: Docket No.: 01-113-P(CN)
Ron Nichols v. Sport & Health, Inc.

Dear Mr. DeMas:

Please find my memo dated 11-16-01 [Attachment A] to Paul Bernado, Manager of Hilton S/H concerning the hostil environment and my allegations of continuing discrimination directed toward me. Jesse Parker is a white male, in his early 20"s, and recently hired. I sent a copy of this memo to S/H VP, Pam Curran 11-23-01 Certified Mail [Attachment B].

I find amazing that, S/H made Jesse Parker Manager on Duty[MOD] when he was just hired months ago. S/H did not make me MOD until I had worked for S/H at least three years and I had worked tirelessly to keep the Hilton S/H Club open during the crippling Washington snow storm/shut down of winter 2000. Also, Jesse is provided more enhancing work hours as MOD than I am. Jesse works Saturday night and Sunday morning as MOD. I work only Friday evening from 5-10PM as MOD. Plus Jesse's education/experience level doesn't come close to that of mine.

Could your office please include and consider all of the above in your investigation of my complaint? Thank you.

Sincerely,


Ron Nichols

Attachments: Above Mentioned

Plaintiff's Exhibit #43

# Hilton/ Sport & Health MEETING

### Thursday, July 19
### 1:00 – 2:00 p.m.

| Agenda | | Time |
|---|---|---|
| ➢ Welcome Don Konz/Dan Burns | | 1:00 – 1:05 |
| | | |
| New extension for health club with Mr. Edwards | | 1:05 – 1:15 |
| | | |
| Items from previous meeting | | 1:15 – 1:25 |
|    Lifeguard uniforms | COMPLETED 6/22/01 | |
|    Cardio machine plastic mats | PENDING | |
|    Massage room/storage room | COMPLETED 7/1/01 | |
|    No extra towels | COMPLETED | |
|    Bid for Cardio Theater | COMPLETED 7/12/01 | |
|    Steam rooms | PENDING | |
|    Guest waivers | PENDING | |
|    Massage rates | PENDING | |
|    New promotion for August | COMPLETED | |
|    Audit/Budget | PENDING | |
| | | |
| P/L statement for June | | 1:25 – 1:30 |
| Promotion for August | | |
| | | |
| New GM (training)/transition/ | | 1:30 – 1:35 |
| Training/Subjective Review | | |
| | | |
| Feedback from hotel (upcoming business) | | 1:35 – 1:40 |
| | | |
| ➢ Ron Nichols Update | | 1:40 – 1:45 |
| | | |
| Miscellaneous | | 1:45 – 1:50 |



Plaintiff's Exhibit #44